NW Coalition for Alternative to Pesticides v. EPA NW Coalition for Alternative to Pesticides v. EPA EPA failed to protect infants and children from exposure to pesticides as required by law. Specifically, for seven pesticides that we challenge in this case, EPA failed to apply the tenfold safety factor required by Congress to protect infants and children when setting pesticide tolerances. Those are the approved levels of pesticides on food. Congress included this safety factor to address the risk of harm to infants and children that can occur at exposure levels that won't harm adults. And in particular, the core of this case focuses on developmental neurotoxicity. That refers to harm to the developing nervous system based on fetal exposure at a level that would not cause harm to adults. Can I jump in and ask you to walk us through the 28-J letter we got that indicated that the argument of the DNT studies is not being pursued, at least as to two or maybe three of the pesticides at issue? Sure, Your Honor. We've challenged seven pesticides in this case, and for five of them, EPA required a developmental neurotoxicity study and never received or reviewed it. The 28-J letter that EPA submitted last week said or argued that circumstances have changed for three pesticides. And in our response, we concede that circumstances have changed for two, so that in those cases, the DNT argument is no longer valid for those two pesticides. And that is halosulfuromethyl, a pesticide for which EPA reversed its determination and decided that a DNT study is no longer necessary, and another pesticide, zeta-cypermethrin, for which EPA actually received and reviewed the DNT study. The third pesticide that EPA presented in its 28-J letter, acetamiprid, the very rulemaking that EPA cites says that they haven't actually reviewed or, it's unclear from the language of the notice, even received a final DNT study. So, that is still a valid claim, and the two remaining pesticides weren't addressed. So, to narrow it down, there are three pesticides out of the seven in this case for which a DNT study has been required, but never received and reviewed by EPA. Can you also explain for me what the word required means? Well, it seems to be used in a technical sense. The sites in the brief were to internal memos of the EPA with the recommendations there to DNT studies, but I didn't see any document requiring the pesticide manufacturer to provide this. The document that requires it is in the form of a data calling notice, which isn't in the record. EPA didn't put that in the administrative record. Although the rulemaking that we challenged below in the administrative proceedings each note that a DNT study has been required. And, in fact, under the statute and the regulations, EPA can only require such a study if it's necessary to ensure safety. And, there's no dispute in this case, neither the interveners nor EPA argue that they've made a finding that these studies are needed to evaluate the risks of these pesticides. So, EPA sent what you were calling a data calling record, and that would just be a, is that a form or what does that look like? It's a letter or a notice requiring submission of a study. And, there are outstanding DNT studies for the pesticides that we've discussed. Now, three pesticides in this case. And, the reason that that's especially critical is that developmental neurotoxicity goes to the core of what Congress was worried about. Are you withdrawing your objection or not pressing your objection further on appeal for two of the pesticides just as to the lack of a DNT study? That's right. Not on the water model study. That's right. So, it's still in play. All five are in play on the water model. Three are in play on the DNT study. And, those three are the acetamiprid, how did you pronounce that? Acetamiprid. Acetamiprid. Mepiquat. Mepiquat. And, thymetrazine. Got it. Easy for you to take. Your Honor, actually, the water model and the pre- and postnatal toxicity argument applies to seven pesticides. The DNT argument applies to three now. Okay. And, just to give kind of the classic example of developmental neurotoxicity, fetal alcohol syndrome is the classic example, where fetal exposure to alcohol at very low levels can cause permanent disabling neurological impairment at an exposure level that would cause no harm at all to adults. And, that's exactly the kind of risk that is at issue here that these DNT studies were required to address. Some pesticides do have a similar developmental neurotoxic effect. We argued in our objections, and EPA itself has stated that there's no way to predict in advance which pesticides will demonstrate that effect. And, the required but missing study goes exactly to that issue. And, it's the only study that goes to that issue that EPA has validated and required of these manufacturers. Now, EPA says, in their denial of the objections and in their brief, that they had gone through a science analysis, and it's laid out to explain why, for these particular chemicals, they did not think that the DNT was necessary to give that piece of information. And, we give some deferential review to that. In reading your brief, the implication I had was there should be a per se rule that if you don't have the DNT studied, then EPA's information is not reliable. Why isn't EPA's scientific analysis of why they had adequate, reliable data, even in the absence of DNT, something that we need to defer to? EPA gets deference, Your Honor, up to the point that they concluded that a DNT study is needed to evaluate the risks. At that point, Congress mandates what happens next. A tensile safety factor must be applied to account for that risk. And, EPA cannot make a prediction about the results of unpredictable studies that they haven't yet received. Well, it's a point that they've made that determination. They've sent in the data call-in record, and they've asked for the information. They've made a determination for the regulation that's required in order for them to complete their study. Failure, then, to receive and review it would be a violation of the statutory requirement. Is that the argument you're making? That's correct, Your Honor. And, the only thing I say is that we don't argue that it's a per se rule that for any pesticide, if they don't have a DNT study, they must apply genetics. We're only saying that where EPA itself has made the finding that a DNT study is necessary and they don't make that finding for every pesticide. In fact, out of 450 or so food-use pesticides, EPA has only made that determination for about 50. So, they've made a case-by-case decision that this study is necessary for these pesticides. In the absence of that necessary study, EPA can't waive the safety factor. And, I think it's important to emphasize that this study goes to the core of what the safety factor provision is intended to address. The language that Congress used is to take into account potential pre- and post-natal toxicity. And, that's exactly what the developmental neurotoxicity study looks at, the potential for developmental neurological harm based on fetal exposure or exposure in early childhood. So, this isn't a study that addresses some tangential issue that's missing. It's actually a study that goes to the core of this congressional requirement. Could I ask you about the two that you got the study? And, we haven't seen the study, so I don't know what the results are. The results of that, the tolerance doesn't have to be changed because you withdrew your appeal on pest to those two? Well, that's what EPA concluded for one of them, Your Honor. EPA got the study and evaluated it for one. EPA decided that the study was no longer necessary after all for the other. So, that's why we withdrew our DNT argument for those two pesticides. So, you're not saying that you need to do a DNT study for all pesticides. You're just saying, and I think you said it and I just want to clarify, you're saying that where the EPA makes a finding that a DNT study is required for that specific pesticide, it's either as a matter of law or arbitrary and capricious for them to set it lower than ten times the tolerance without first getting the study. That's correct, Your Honor. And, where EPA has withdrawn the study requirement, as it did for one of the pesticides, as noted in the 20HA letter, we may disagree with that determination, but we're not challenging that decision. That's the point at which EPA gets deference. They originally decided the study was required. Now, they've decided it's not. That's certainly consistent with your argument, your action. Now, get to the question I've been wondering, and I'm sure they're going to, you know, answer this differently. But, if all the other materials that they have, all the other data, makes it unnecessary for a conclusion that there's a reasonable certainty of no harm, and that's what the test is, reasonable certainty of no harm, do they have to wait for the DNT study? Yes, Your Honor. Why? Because the DNT is the only study that looks at a particular issue. It's the only study that looks at the effects of fetal exposure on learning and memory, for example. This particular developmental harm. And, again, we asserted that in our objections and, again, in our briefs. But, you know, in some of the, at least one of the things, as reading through the preamble to the regulations and the order, I can't say that I understood it entirely because it's highly scientific. But they seem to indicate that the reason that they had required the DNT study in the first place was not related to the effects on children and infants. They had to do with something about something forming in the blood. I don't remember the exact words. So if they required the DNT for reasons not even relating to the safety factor, why are they required to have that information before they make an evaluation of the data they do have and find that it's adequate and reliable? Well, Your Honor, the specific example you're referring to is only one of the pesticides. Am I referring to something that's great? As far as the levels in the blood. That was referring to pinetrazine. But EPA did make a determination that this study, for example, they don't have the authority to require the study for any other reason than that is necessary to ensure safety. Under the regs, again, this is 40 CFR 158.75. And also under the tolerance regulations, it's 40 CFR 180.7B11. And it's in the statute as well. EPA can't require a study unless they need to look at the results of that study to evaluate the risks. What's the statutory site? The statutory site is in the FFPCA. It's 21 U.S. Code 346A. B2A9. And 7 U.S. Code 136A. C2B. The first of those... You were obviously never exposed to this stuff, prenatally. The first of those sites is the Federal Food, Drug, and Cosmetic Act. That's the statute that deals with the boxes. The second is FFPR. That deals with the FFPCA registrations. So the EPA... And to respond directly to your question, Your Honor, EPA has not argued that these tests are not necessary to look at safety. EPA has only argued that they can make a decision based on other information that they have in the absence of these sites. And why doesn't that meet the statute, which just says that the administrator may use a different margin of safety if, on the basis of reliable data, such margin will be safe for infants and children? I didn't see in your brief an argument that the data that the EPA actually relied on was not reliable for some scientific reasons, only that it couldn't be reliable in the absence of this D&T data. Was there anything wrong about the data that the EPA, in fact, relied on in making its conclusion? We're not challenging the other data that EPA has. We're saying that reliable data has to have two parts. It has to be good science, and it has to address the important issue. So the good science question goes to whether the study is properly conducted, they used the right number of animals, the lab results were valid, everything like that. And we're not challenging that. But EPA can't say we have reliable data to evaluate a missing study when all of the other data that they have goes to another question. It's irrelevant. So reliable data necessarily includes those two components, good science but also relevant, on point to the question at issue. I think also in discussing the statutory language, it's important to keep in mind the whole statutory context. And this is a health protective statute. Congress said in the absence of data, err on the side of caution. And even the clause that allows EPA to waive the safety factor, it sets up a mandatory presumption that the safety factor will be applied and says EPA may apply a different factor only if, on the basis of reliable data, a different number will ensure safety or a reasonable certainty of no harm. And other cases in this circuit, and we cited a recent case in the D&T circuit as well, have said that we need to look at the overall intent of the statute in interpreting a provision such as this. And in this case, EPA has reversed the statutory presumption. EPA's argument is petitioners haven't presented information showing that the missing D&T study would show harm. But Congress set up the opposite presumption. EPA needs affirmative proof that there is no harm before they may waive the safety factor. EPA needs affirmative proof that a lower safety factor will protect infants and children, and that's what's missing here. Well, EPA says that's what they did, and they lay it out both in their preamble to the tolerance regulations and in the denial of the objection. Based on the data they have, they made a professional judgment. They provide some explanation of why their judgment was reasonable. EPA argues that they made a prediction about the outcome of these studies that they don't have. And they said, in response to the objections, the petitioners have presented no evidence that the study that we don't have would come out a different way. And that's where EPA has reversed the statutory presumption. They're not looking. They're not basing their decision on reliable data. But even if they have the D&T study, EPA would still have to make a prediction. I mean, the D&T study is going to be something on rats, you know. So you have to extrapolate from that and make a prediction as to how it would affect children. So I don't see how a scientist in this context could ever get away from making a prediction. Well, that's right, Your Honor. There is a built-in extrapolation from all of the animal studies and other kinds of studies that EPA relies on. But in this case, EPA has identified a particular concern for each of these pesticides. Now, there are different reasons for each pesticide, but it's specific to each pesticide and triggered this study, required the manufacturer to submit those studies, never received them, or in the case of one of the studies, apparently received them but hasn't finished evaluating it, and waived the safety factor nevertheless. And that's what violates the language that Congress included in the Food Quality Protection Act. One other, just to get quickly, I see I'm in my rebuttal time, to get quickly to the two other issues that we raised, Your Honor. EPA lacks any data at all on drinking water exposure, and EPA also has affirmative data of actual pre-imposed natal toxicity for all seven of the pesticides at issue. In other words, the statute requires the tenfold safety factor to account for potential pre-imposed natal toxicity. And we've cited record evidence in our briefs to show that there's not just potential, there's actual pre-imposed natal harm ranging from birth defects to brain damage to developmental disability caused by exposure to these pesticides. So, in light of evidence of actual pre-imposed natal harm, EPA doesn't have the discretion to waive the safety factor. If there are no further questions, I'll reserve the rest of my time. Thank you. Good morning. May it please the Court, I'm Kent Hanson from the Department of Justice, representing the Environmental Protection Agency. With me at counsel table this morning is Jonathan Fluches of the Environmental Protection Agency. In the arguments this morning, the petitioners made two statements that are not exactly right. The first statement is that the statute requires, under the language of the statute itself, that it requires a D&T study in these circumstances. The standard established by the statute is a broad one and requires no particular studies of any kind. The standard is, is there a reasonable certainty of no harm. That is a case-by-case determination that EPA makes based upon all of the evidence in front of it, which they did in this case, which is not being challenged by the petitioners in this case. They want to draw a line and they say whenever EPA requests a D&T study, or any study for that matter, but a D&T study in this case, they are precluded from considering all of the evidence they have and reaching the determination as if that evidence adds up to a reasonable certainty of no harm. Before you get to the second statement that you alleged, why didn't you get the D&T studies from the chemical manufacturers if in fact you requested them? Is that correct that you send in a call-in, a data call-in letter to the applicant? That's one way. And the call-in in this case is not in the record. The call-in that was issued in this case was not through the formal data call-in notice, but it was a more informal request for additional data. And how was that request made? It was conveyed basically by letter. It was done under authority and not at the statutory site that the petitioners cited. But it was cited, the citation is actually to Section 408F. And 408F1 is the authority under which EPA... Could you give me the citation, please? I'm sorry. Section 408.       Section 408. Section 408. Section 408. Section 408 of the Act, the code citation is 46AF. Thank you. I'm sorry, 46USC... 21USC... 21USC. ...346AF. Okay. AF. AF? Yes. And that is the authority that that statute, part of the statute, gives EPA is to request any evidence and data that goes to safety, and it restricts their scope only to safety. But whenever they have a question about safety, regardless of how significant that question may be, they have the authority to request more data, and in this case, they requested more data. Also not in the record, but the petitioner's statement is incorrect, that the D&T studies have not been received. I'm... You're dropping... You're dropping your end of the sentence. What is not in the record is that the D&T studies have been received for all pesticides. EPA has not rendered a formal action based upon the D&T studies that have been received for the three pesticides that remain at issue in this case. You say again that you received the D&T studies for all of them now? Yes. So if we remanded it saying it's arbitrary, capricious, or violation of law to do it without a D&T study, they would say... They would render... ...thank you, but we now have the studies, same result. Well, they would review the D&T studies and arrive at a result. They believe, you know, they did not predict the results of the D&T studies precisely. What they did is they looked at all of the evidence and they said, how important are these D&T studies to us understanding the data? For example, with halosulfuron, let me just get to the second point, the non-statutory point, which is EPA has lots of data regarding developmental neurotoxicity. They have five core studies. All of which look at toxicity at some level, or neurological toxicity. A couple of the tests look precisely at developmental toxicity. They have lots of data. None of that is being challenged. None of the conclusions that EPA drew from that data is being challenged today. What they did is they looked and they said, in light of what we have, do we really need a D&T study to tell us more? Yes, it will tell us a little bit more. Not because it tells us something that we have no data on whatsoever, but because it's additional data. It's like if I fell down and broke my arm. And I go to the doctor and the doctor says, you fell down where? I'm sorry. And broke my arm. Broke your arm. And I go to the doctor and the doctor says, you have all the clinical signs of a broken arm. And we're going to do a test. We're going to run an x-ray. And the x-ray shows a fracture. And the doctor says, okay, I'm going to set your arm. The doctor could say, you know, an MRI is a much more sensitive test. So let's do an MRI. But he doesn't need that data. And that's similar to the role of the D&T studies that EPA looked at the data that it had and said, we can make a judgment based upon a reasonable certainty that there is no harm without the D&T studies. I mean, your arm hypothesis, your example is the risk of a false positive. And what we're worried about here is the risk of a false negative. You don't need to have the extra safety factor. Why wouldn't the EPA wait to get the results of a more sensitive test if, in fact, they had requested the applicant to provide it? What's the practical reason why you wouldn't just wait to get it? The practical reason is that new data is coming out all the time. And EPA is sending out requests, formal and informal, for additional data. And they're always receiving new data. This is not an absolute certainty. This is an evolving science, if you will. And so the standard that the statute gives us is that the decision has to be based upon a reasonable certainty of no harm, not unlike the federal rules of evidence for expert testimony. The only difference, really, being here is that EPA is an expert that gets deference. But it's a reasonable certainty of no harm, not absolute certainty. Not do you have every piece of data that you could possibly get at this point in time, but do you have enough data in which to draw a conclusion that, based on a reasonable certainty, there will be no harm to children. So you require a broad universe of data. You have your core toxicological set, and then you may require other data. And there's a stream of data coming in. And at the point where the scientists conclude, we have enough to make our determination, then you don't wait for a further report. Is that how it would work? That's correct. Well, then we need to be convinced and be comfortable with the idea that it wasn't an arbitrary and capricious decision, that the EPA thought the data they already had was the right data to make the decision, right? Yes, but that needs to be challenged first by the petitioners. They need to raise an objection. And as they conceded, both in their briefs and in arguments, they did not challenge that. And under the principles of issue exhaustion, they cannot raise a no. Well, I mean, I think you're right to a degree and wrong to a degree. What they're saying is that the DNT test shows something that none of the other tests show, and so therefore, your data wouldn't be sufficient to conclude that the prenatal developmental harm wouldn't take place with a certain level of pesticides. That's a very broad and somewhat inaccurate characterization of the DNT test. And it also goes beyond their specific objections and the grounds for their objections that they gave on the administrative record. They said simply that the DNT test is more sensitive. And they looked at three particular things to reach that conclusion. EPA's request with regard to another pesticide, chlorpyrifos, if I'm saying that correctly, in which a DNT test was requested, and EPA went ahead and set the safe dose without a DNT test. They later got the DNT test, and the DNT test didn't change anything. The safe dose remained unchanged. So that example of the criticality of the DNT test does not support their claim. The second thing they did is they looked at a study by Susan Maguire. Why not go further? Why not do the same test with the others? Because we're dealing with fetal harm, with infants. Shouldn't we go as far as we can go scientifically? And we do. EPA does. Sure. The core tests that were performed with regard to each of the pesticides, and they're analyzed, they're summarized in the record on the high arc committee reports. They examined the kinds of tests that were done, the results, and EPA weighed the results. And those tests include tests on pregnant rats. They include tests as a result, they'll know the results on the fetuses. In some cases, they saw, and this is a good example perhaps, they saw toxicity in the mothers, but no toxicity in the pups. Now, who's more sensitive? With toxicity in what? No toxicity in the pups, the rattles. Pups. Rat babies. Well, rat babies are called pups. Okay. Well, is it true that the DNT test shows or provides data that is not available from any other test and that data that's necessary to determine a safety factor? It is true. It's incremental. And it gives us more data that will be added to the data we already have on those tests. But again, it depends on the circumstances. And my broken arm example is not that far off. On Helen's Sulphuron, for example, the toxicity showed up only very near what's called the limit dose. If you give a mammal a dose large enough of anything, it will overwhelm the system and kill it. This was a large dose that approached the limit dose. There were some signs of neurotoxicity in the young with that dose. However, there were other signs of toxicity. And that dose was like 700 milligrams per kilogram of body weight, something like that. There were other signs of toxicity at much lower doses to the adults. And it was for some other effect altogether. I'm not sure if I'm confusing it. To the adults, you say? Yes. And so EPA uses that low number, the lowest NOEL, no observable adverse effects level. They use that lowest number to drive their risk assessment equation. So, at a certain level, do we need to know more from a D&T study in order to confirm, get a little more data exactly what those effects are by doing the D&T study when it's such a high level? Yes. And have the safety factors ratcheting down from there. That's correct. So, that's the reason why you need to do a case-by-case analysis. And you just can't draw a bright line and say, once you request more data, you have to wait to take any action before you get that data. It depends upon the nature of the data you have. Can I ask? I'm wondering whether we should be deciding this case at the moment. Because you said the D&T tests are in. And doesn't the EPA reevaluate the tolerances now that the D&T tests are in? They will reevaluate. Right. So, if you're going to do what the plaintiff is asking for anyway, why should we be telling you to do something you're going to do anyway? Well... So, in other words, to a degree, is there a certain mootness problem here? At least, not on the water modeling part, but on the issue of the D&T test. Not on which part? The water modeling. Right. In a way, it's kind of the recurring but evading review type of issue with regard to it. And it depends upon how you characterize the issue NRDC has raised. If it is an attack on our case-by-case analysis and looking at all the evidence and saying, well, the evidence is about to change and there's going to be a new decision, you know, you can reach that. But if you buy into their argument that once you request the data on the EPA, on your 407F, or just as a practical matter, as a scientific matter, the rest of the data becomes irrelevant. You have to ignore it. You can't look at it. You can't make a decision. You have to wait until the new data comes in. Once you request that data, what does that do? But why should we decide that? Because you already have the data. And it seems to me that that objection is moot. I mean, I guess you would like a decision saying, don't make these arguments anymore. You know, in a way, I wouldn't... You wouldn't mind that. I wouldn't mind a moot decision either. But you already have them. And I'm going to ask them if they dispute that. But if you already have the BNT... I mean, you know, I'd be a fool if I didn't tell you I thought this was really complicated. And it is. And, you know, for us, there's a certain deference to agency determinations that's appropriate and necessary in our system. And when we get into all that and we consider whether we're going to override the deference under Chevron, that type of analysis... It's really not Chevron exactly, but it's a deference given to administrative findings. It seems to me unnecessary to do that because you already have what they say you should have before you make a decision. And you're going to reconsider it anyway. Perhaps I'm arguing their case. But in the meantime, we have a tolerance that's effective. That's necessary for the industry in order to use pesticides that are effective. And I guess they're spraying with that tolerance. How often do you revisit these tolerances? I guess because of the 28-J letter, it seems like there's a cycle of re-review. The review depends in part upon the evidence that comes in. And they're required by statute to revisit the tolerance every five years. Would you want us to stay deciding the case because you're going to reconsider it anyway? Because you're going to do what you think is the right thing in which they're telling us we should order you to do. You're going to do it anyway, right? You're going to re-evaluate the tolerances based upon the DNT studies. That's correct. So that's the best result that they could get here, which you're going to do anyway. If you're going to do that in the near future, should we stay deciding that part of the case until you do that? And then it is moved. Until the next case, until we get more data that we request. You know, just in terms of the legal nicety of that, that does not seem to be the right solution to me. I can't do better than that. Well, it seems to me if we were to rule in the appellant's favor, we'd be telling you to do something that you're going to do anyway. Yes, but the point is that that's always true. We're always requesting receiving the data. The government, at least at the district court level, always seems to tell me, like in immigration cases or whatever, they'll say, you know, look, we'll take care of this, they take care of it, and then I don't have to order the release of a person or whatever. They would rather do it on their own. That's what I'm asking. Does the EPA think that it's appropriate? No. Yeah, come on up. Well, it's... Energy can make their own argument, Your Honor, but essentially what they're doing, they're saying that we made a mistake when we ran out of time. Right. And we face this situation all the time in terms of data being requested, not there, and we have to make a decision about the safety factors. And so... Well, why do you have to make the decision until you get the data yet? Well, we... Are you getting pressure from industry? Is that it? Well, as counsel pointed out, we are requesting data numerous times. It recurs. And so we constantly have a situation where new data comes about, we're always developing new tests, and we're asking for new data. So you could get a situation where we couldn't make decisions because there could potentially always be another test that we're waiting for. Or you would have a disincentive to order new tests. Well, that would be true, too. You're getting a constant stream of data, it sounds like, from what I understood from counsel. And at some point, you have to make a decision when you have enough. Is that correct? That's correct, Your Honor. And so... essentially what the petitioners here have challenged is what we have done in a particular instance. And they're not challenging, essentially, what we do with the data when it comes in. It's the ability to make a decision at a point in time. Right. And we think they have misinterpreted the law in their interpretations they've described today, which is whenever we think there could be any more data that would inform the safety decision, we have to stop. We either have to require the full tenfold factor, no matter how much other data we have on that point, or we have to wait for the data. Thank you. Along those lines, I would point out that the 408F section that I cited to indicates a process by which EPA requests data that it regards as necessary for safety. And then after reviewing that data, it can then make a determination as to whether or not the tolerance needs to be readjusted or revoked. If we use the petitioner's process, the simple request for more data would automatically mean the tolerance needs to be suspended at that point before the data is received and reviewed, simply because EPA deemed it to be necessary. That's not how Congress anticipated how it would work. And as a practical matter, that's not the way it should work. But refining it down, it gets back to where I think perhaps we started from. That is, the data that you have, how does that allow you to predict that these tolerances are safe vis-a-vis prenatal developmental problems? And that's not the challenge that was made. The record is replete with EPA's summary. And in their final order, not on denying the objection, but on establishing the tolerance, the record discusses in detail, summarizes in the final order, and the underlying documents in the record discuss in detail each of the tests and the results of those tests and what the evidence was that EPA based their tests on, their conclusion on. So it was looked at. There was a lot of data. It hasn't been challenged. Instead, they looked at... I think what they're saying, and maybe they're wrong about saying this, but what they're saying is that the tests don't deal with that issue. They're not challenging the data that you have or the tests that were done, but they're saying that the tests don't reach the issue of prenatal development. Well, they're saying that the tests look at another aspect of neurotoxicity. But the question they're really raising is, is it essential that that additional data be in hand before a decision can be made? And in order to know that, you really have to look at the rest of the data. Their challenge here should have been, EPA reached the wrong conclusion on neurotoxicity because their data didn't support it. It only went so far. The studies were inadequate, and they needed this essential element because of the unique facts of the pesticide, not because it was near the limit dose, not because only the adults were, you know. But look at each one. I understand, but how do I conclude that they made a rational determination that the prenatal development would not be impacted by these particular tolerance? Some, there's no extra tolerance, and some there are three. That's not the issue before the court. The issue before the court is whether EPA's ruling on the objections and the specific points raised by the objections was arbitrary and capricious. Whether they said, we cannot draw a bright line, one-size-fits-all test that says, whenever we request a D&D, we have to not act on the safety factor issue. EPA addressed each of those. Well, maybe I'm missing, but it seems to me that they make that argument by saying, look, you can't set these tolerances below 10 until you get the D&T test. And you're saying, yes, we can because our data shows that the D&T test really isn't going to change anything. Well, EPA ruled on the objections by addressing each of the points raised by the petitioners as to why the D&T tests were unusual, why they were unusually sensitive, why they provided data that was essential, they could not do without. And it's that decision, whether or not EPA properly ruled on those objections, if that's really been, is the subject of this petition. Right, and that's what I'm asking. How do I feel comfortable saying that the EPA made it? But I think you're asking the flip side, which is a perfectly good question, which is, how can I be convinced that what EPA did still means the tolerance is safe? Okay. Well, no, that they looked at the particular item, that is the prenatal development that the D&T test is supposed to reach. Well, their examination of that data is in their final rule setting the tolerance. And you're saying that they looked at it from a different aspect and there's no challenge to that data? That's correct. Okay, I get it. I get what you're saying. Time's up. There are a lot of other issues. I'd be happy to address any other questions. Well, if there's anything you need to tell us, it's important, I presume. I think you keyed in on probably the central issue. All right. Thanks. Good morning, Your Honors. My name is Ken Weinstein, and I'm representing the intervener, CropLife America. And I think that this case is an example, a good example of a statute that really is working exactly the way Congress intended it to work. In 1996, Congress passed amendments to the Food, Drug, and Cosmetic Act that said you have to emphasize, give more emphasis to the risks to children. And in 1999, EPA, for the first time, adopted the D&T study. And prior to that time, as counsel mentioned, there are a series of seven tests that get to the precise issue that Judge Moskowitz pointed to, which is what are the potential effects on children and what are the potential neurotoxic effects. And there are seven core studies that address aspects of that issue. There are two developmental toxicity studies in rats and rabbits, and those studies show developmental effects in fetuses. So those are part of the core database. There are two neurotoxicity studies. There's an acute and a subchronic neurotoxicity study, part of the core database. And they show potential neurotoxic effects. There's a two-generation reproduction study that's done. That shows potential reproductive effects. And there are two lifetime studies, chronic studies, that examine the entire lifetime of the animals and see are there any adverse effects here, are there neurotoxic effects, and so forth. And so those are, and in the case of these five pesticides, those databases were complete. EPA evaluated those data. They found all of those studies to be properly done and acceptable. And those studies constitute the reliable data that the statute asks for that says, look, we've looked at this, and here's the conclusion we reach. And Judge Ikuta asked the question, well, what's the significance, then, of requiring a DNT study? There must be some impetus for that. And there is. And that impetus can be, it could be a very serious effect that comes out from the other seven studies. And in that case, EPA will say, we're applying the full 10x factor until we get the DNT. And it can be a minor effect. They may see a potential neurotoxic effect in an adult, not in children, but in adults. And the EPA says, we want to know what's going on here. We want to hunt this down to a conclusion and rule out the possibility of anything adverse. But we don't think it's serious. And as I said, in the case for these five pesticides, we had a low level of concern based on our evaluation of the core database that there's anything that's going to affect children. So they looked at... So why take a chance if there's one other, one additional? Well, we're not taking a chance. What the scientists are saying is, the EPA scientists are saying, we are... The scientists tell us a lot of things. And we know that they're wrong. And we know that there's pesticides out there that harm people, even though the scientists say that they won't. Well, the EPA... Well, the court's job is not to second-guess the agency and it's not to substitute its own judgment. My job is to do the right thing. We all agree with that. And the right thing is to let the EPA... After all, Congress said to EPA, use 10x. First of all, you have to find a reasonable certainty, no harm. If you don't find a reasonable certainty, certainty, then you can't... What does reasonable certainty mean? It means that you can't have a significant doubt. If you have a significant doubt... Beyond a reasonable doubt? Reasonable certainty is something close to whether there's a reasonable doubt as to safety. The scientist in this court has to make sure the EPA applies that standard, okay? They also have to start with a presumption that you're going to use 10x. And they also have to look at potential... What do you think reasonable certainty means? Reasonable certainty means, I think... On a scale of 1 to 100. Reasonably certain means you're pretty close to 100. You're not at 100, but you're, you know, 95%, 98%. It's something in that order. You have to be reasonably certain. How about 99%? 99%. But... It stipulates it right now. But that's exactly what EPA did here. And the reason that they said they were reasonably certain was they look at what's the safe dose based on the other studies, the core studies, okay? They say, we know that this dose is safe. And they look at the DNT study. And they know what doses are going to be used in the DNT study. And in one of the cases, for example, they said, look, the safe dose from the other studies is 30 times lower. And even the lowest dose that would be used in the DNT study. It's 30 times lower. So no matter what happens in the DNT study, we know we're already using a safe dose. It won't make any difference what the DNT study shows. In another... For another one of the pesticides, EPA said, we did a risk assessment. They always do a risk assessment. And they found that the risk was virtually infinitesimal. They look at the amount of exposure to the pesticide. And they say, look, the amount of exposure is 1% of the safe dose. So even if we applied a full 10X, it's not going to change the fact that we are reasonably certain that there's no risk here to children. The EPA scientists went through that kind of analysis, pesticide by pesticide, study by study. And they said, we have a very low level of concern here. We don't think that this DNT study is going to change anything. And that's exactly what Congress asked them to do. Congress used the word potential pre- or post-natal effects. So Congress said to EPA, you have to look at the potential for effects to children. And that's exactly what EPA did here. They looked at the potential for effects to children based on the existing data. Who drafted all that language? That language was drafted by Congressional aides. It was not industry. It was mostly the Congressional staff who drafted that language. Does industry have any participation in it? Interestingly enough, that law was passed in 1996 and at that time the law was drafted based on previous legislation in a period of days. And it was enacted in a period of days without any industry, virtually any industry input. That language was intended to be very protective of children. And it has been. It's been very successful and it's worked properly. The EPA scientists are extremely conservative. They look and so this court has to see whether EPA used the right factors. And they did. They used all of the statutory factors that Congress told them to use and they found that there was a reasonable certainty of no harm. So we would ask this court not to kick the not to defer ruling on the case. It's true that the DNT studies were submitted as EPA requested. They've all been submitted. They were submitted timely. But the decision really before the court is well, EPA made a decision as of the time it issued its order denying the revocation of the tolerances. And the court should really decide the case as of that point in time. And I think that there When did EPA decide to fit the additional test? When did they decide that it should be done? They decide for each pesticide they did not issue a data call-in notice and say it's urgent that you submit this study. What happened was a manufacturer submits an application either to enlarge its existing license or put a new crop on the land. Was that done in response to this lawsuit? No. It was in response to a request by the manufacturer to grant a license. And EPA said okay, but we'd also like to see you do this additional study. Are you saying you didn't get a data call-in order? There was no data call-in order. What exactly did the EPA send out to request the data? They sent a letter to the manufacturer saying as a condition for the use that you want to register, you have to do this study. And did they cite the statutory section? I think it was 408 Most of this is done under FFFR rather than the FFPCA. When EPA is requiring new studies and EPA has broad discretion to require virtually any study that it wants. It's done under what? It's done under FFRA. The Federal Insecticide, Fungicide, and Rodenticide Act, which is the licensing statute for pesticides. And EPA's authority to ask for data under that statute is extremely broad. And they can ask for virtually anything they want and they do. So in conclusion, the case is not as complex as it may seem at first glance. EPA did everything that it was asked to do by the statute. It went through the technical analyses in excruciating detail. They found low concern raised by the existing database. And so in these particular cases they said we can lower the 10x because we have a reliable database and we are convinced that it's reasonably safe. What's the mission of CropWise America? What is what? The mission. What's the mission? It's a manufacturers trade association and so we're representing the interest of the manufacturers. Of pesticides. Yes. Thank you. Thank you. Could you give me the language? I'm just looking at, and I know he referred to the pesticide statute 7 USC 136 A C 2 B. I was looking at the language and it says that if the administrator determines that the additional data are required to maintain in effect an existing registration of pesticides, the administration shall notify all existing registrants of the pesticide to which the determination relates and provide a list of such registrations to other interested persons. So that means they can ask when they already have a tolerance something registered, they can ask for further information. But they didn't have to use that in this case. The manufacturer was asking for permission. That's what I'm... If you want approval of what you're asking for, go to the district. Well, that's what I'm trying to figure out. And that's why I was actually asking him. What is the authority? Because what you're saying is look, if they ask for that under this particular statute, they're saying it's needed and therefore they can't make a decision without it. I'm trying to look at what is the statute. I didn't find it in 21 USC 346 A B 2 A 9. You cited that. I don't have the CFRs with me. Let me draw a distinction between a registration and a tolerance first. A registration is a license for pesticide use that does not include particular food uses. So FFRA sets up this registration scheme and EPA can ask for new data under FFRA for a pesticide that's already registered. That's apparent from the statute. And a tolerance has to be developed for every food use. I understand that. But just to your argument and it really simplifies things whether it's right or wrong. You're saying that look, if they ask for this information, they can only ask, they can only require a study if they find it necessary for safety. And therefore if it's necessary for safety, they can't say that there's a reasonable certainty that there's no harm without getting the study first. That's right. And I'll explain how the tolerances got to this point. These came through the four-way D petition process in the FFPCA. And the statute says that when a manufacturer petitions for a tolerance, they have to include certain information. And that information includes the core basic set of studies that Intervenors Council talked about. And then the FFPCA provision that I cited to you earlier, this is D2A9, I'll read it, says a petition must also include... You're on 346A. 346A. Yeah, let me get there. It's helpful if I read along. In the appendix in our opening brief, it's at page 9 of the Westlaw printout. The FFPCA. Page 9. Is it page 9? Did you see where at the top it says page 9 of 24? Okay. I'm there. Okay, so at the very top it says D, petition for tolerance or exemption. D2, petition content. It's about a quarter of the way down the page. And then D2A, a petition to establish a tolerance shall be supported by such data and information as are specified in regulations issued by the administrator. And that includes the core data that Intervenors Council addressed. And then the next to last subparagraph at the bottom of the page, subsection 9 here says, such information as the administrator may require to make the determination under subsection B2C of this section. And B2C is the safety finding. That's the provision that says you need to ensure no safety and apply a temporary... But how do you know that the request for the DNA, the DNP studies was pursuant to B2C? Because that's the only way that it could have been requested. How do you... How do I conclude that? I think there are two answers. One is we argued in our briefs and EPA and the intervenors did not dispute that. So that was not disputed in the briefs. And second, this is a new tolerance under subsection D. So the petitioner must... The industry acting for the tolerance must provide this information. The provision that EPA cited, this is now on page 11 of 24, with subsection F, that deals with an entirely different issue. And EPA never cited that provision in its briefs to say that this was the authority that they used to require the DNP studies. This provision says if the administrator determines that additional data are reasonably required to support the continuation of a tolerance. So that presumes that a tolerance already exists. But in the situation here, these tolerances did not exist. The manufacturers asked for the right to apply pesticides to these food crops. To answer your question with one more cite, and I'm sorry if you don't have 40 CFR, I don't think we included this in the appendix. So I'll read it. This is, and again... Why don't you leave a copy with the clerk? Which one are you reading? I'll read 40 CFR 158.75. And we did quote the relevant language in our briefs. Okay, go ahead. And 158.75, requirements for additional data. This is EPA routinely required by Part 158, that's the core steps that interveners talked about, may not be sufficient to permit EPA to evaluate every pesticide product. If the information required under this part is not sufficient to evaluate the potential of the product to cause unreasonable adverse effects on manner of the environment, additional data requirements will be imposed. So EPA's only authority to impose additional data requirements is under this statutory section to which it relates. When the request for the data went out, did it say, pursuant to such and such? We haven't seen it, Your Honor. It's not in the record. And Interveners Council said that it was in the form of a letter. It was not included in the administrative record, and we haven't seen it. But what we have seen is EPA's tolerance rules, establishing these tolerances back in 01 and 02, that says we concluded that a DNT study was missing and needed. For some of them, they said necessary. For some of them, they said needed. But for all of these pesticides, they said the data is incomplete. The data are incomplete. We are lacking this study. And then they go on to say we make a decision based on the other information. But in each of those Federal Register notices, and we cited each one in our brief, EPA says we don't have this particular study that we required. What about tell me what's wrong with this? That it would be improvident for us to decide the DNT issue at the present time because they now have to test and that they're obligated to reevaluate the tolerances anyway. And so therefore, us making a decision whether they have to wait until they got the test or not is, well, perhaps not moot because the tolerances are presently existing. It would be sort of improvident for us to make that decision telling a co-equal branch of government what to do when they're going to do it on their own anyway. A few answers to that, Your Honor. First, EPA has not committed to and is not obligated to reevaluate these tolerances. EPA made a decision. These tolerances are on the books. They have been since December 2001 for some of them. So that means that for the past six and a half years, these potentially unsafe levels of pesticides are on foods that petitioners, members, and their children are exposed to. So first, the answer is that the harm has been continuing for six years and may continue to be perpetuated while EPA evaluates that data. Second, for at least one of these pesticides, EPA claims to have had the study since 2005. That's one of the FR sites, Federal Register sites, in their 28-J letter. But EPA hasn't evaluated that study. So it's been in their possession for two years but has never been evaluated. EPA's counsel argued incorrectly that EPA reevaluates every tolerance every five years. There's nothing in the statute that requires that. And you're saying they set the tolerance, they should have had this before they set the tolerance, and so a decision by us is necessary because we should be vacating the tolerance and remanding for them to reconsider in light of the VNT studies, which they now have. That's exactly right. And just one last thing on that. They have only argued, and this is as recently as a DNT study for one of the pesticides, and they say that they waived it for another one and that it's in the process of being submitted for a third. So they have never argued, and there's nowhere in the record until today, that they have the DNT study for the final two. That's nowhere in the record up till now has EPA asserted that they have all of them. But in any event, unless the court were to vacate the tolerances along with the remand, then the harm would continue to petitioners. I'd like to address one additional thing. The EPA's counsel argued that our argument would force them to apply the safety factor whenever there's new data that they've asked for at any point and that data is always coming in, and that this would in essence grind the agency's pesticide office to a halt. And there are a few responses to that. One is that EPA does not have an obligation to approve tolerances at any given time. To the contrary, EPA has an obligation to ensure safety. And so if there's a missing study that EPA has said they need to look at to ensure safety, they don't have to meet any deadline to approve a tolerance. The manufacturer has petitioned for it, but it is, as everyone agrees, the manufacturer's obligation to submit all required data in support. And it is EPA's obligation, under the statute, to ensure safety. And in particular, a reasonable certainty of no harm to infants and children. And so the first answer to that argument of the agency is that they have no deadline to approve tolerances, but they do have a congressionally mandated obligation to ensure safety. The second response is that we're not arguing that any time there's any piece of data that might come in that road, that a tolerance has to be canceled, as counsel said at one point, or that... You're saying it wasn't done correctly in the first instance. That's right, Your Honor. And we're also saying that this particular missing study goes to the core of what Congress was worried about. It goes to developmental harm to infants and children. And the statute addresses harm to infants and children. So this isn't some kind of irrelevant study. It has nothing to do with this issue. In fact, it goes to the heart of the relevant issue that Congress was talking about. And finally, the constant stream of data argument ignores the fact that I think Your Honor is referring to, that this came to the agency on the petition, on the manufacturer's petition. They filed a request for these tolerances to be approved. So it is their obligation to submit all the data that EPA has required. And then finally, the tenfold safety factor again creates a presumption that the safety factor will be applied. So the easy answer here is that where EPA has identified missing data that goes to the heart of the issue, they must apply the tenfold safety factor until they receive that data. If they cannot ensure safety even with the tenfold safety factor, then EPA can't approve the tolerance at all. And to address the intervener's argument that there is a wealth of data that goes to the issue, I'll cite what we cited in our briefs, and this is in the record. EPA itself made the finding that none of those other studies address the issue that a developmental neurotoxicity study addresses. So all of the seven basic studies that intervener's counsel cited are beside the point. They may give a hint about the type of harm, but they don't address the type of harm. And at page 130 of the excerpt of record, and this is an EPA memo, EPA says, based on the data currently available, and this is a discussion of their basic studies, it is impossible to predict how many neurotoxic agents will show developmental neurotoxicity, nor do we currently have sufficient information to predict how many agents that are not neurotoxic will cause developmental neurotoxicity. There's another cite, again from the same EPA analysis on page 132. These are just draft memos that are then later on explained by the EPA as to how their new information and how that actually fits into their study. Well, that's correct, Your Honor. This is a draft memo about this issue. But it's the only memo that EPA submitted. In other words, there's no final of this memo in the record, and EPA hasn't disputed the findings in this memo. And furthermore, NREC, one of the petitioners, in the objection, cited its own findings that the DNP study is the only one that looks at effects on learning and memory. And that's in a report that was included with the objections that we filed. So the wealth of other data on a different point is irrelevant to the central question here. Which EPA acknowledged when it required the study for each of these pesticides? So, we, the 9th Circuit has a mediation program. Since they say they're getting the DNP test or have the DNP test, is this something that mediation can work out? I don't think it is, Your Honor, because Everybody wants an answer to the question. Well, first, I think everybody wants an answer. And the capable of repetition yet evading review exception to the mootness doctrine really applies here. Even if EPA had received and evaluated the studies for each of these pesticides, and concluded that they made no difference, and that on the basis of that full suite of data, EPA could weigh up the safety factor, this will recur with other pesticides. And EPA has taken the position that it can require a study and weigh up the safety factor in its absence. And that creates a perverse incentive apparently at issue here, for the manufacturers never to submit required data. This is now 6 years down the road after these pesticides have been approved and have been on the books. So if EPA came to you and said, look, we're going to go through all this, we're going to look at this data and decide whether these columns are correct, and we're going to do it within 6 months, wouldn't you be happy? Only if EPA said, we'll vacate the tolerances in the interim. Because that's the real harm here. That these tolerances allow these particular pesticides on apples, and grapes, and spinach, and zucchini, and squash, and all the other produce, you know, the fruits and vegetables that we listed in the briefs. Seriously. And so if EPA said, we'll vacate the tolerances, the pesticides can no longer be applied to these foods that children eat, while we analyze this, then we've been sure the petitioners would be happy. And since they want an answer to the legal question, they're not likely to give in on that. I think that's right, Your Honor. And since EPA has already taken the position that it can approve the tolerances in the absence of this data, and allow these pesticides to be used on these foods, then I don't think they'd be likely to agree to that. If there are no further questions... Well, thank you very much. Very helpful. Thank you. I will recess until 9 a.m. tomorrow morning. Thank you. ...  ... ...
judges: Pregerson, Ikuta, Moskowitz